# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| |  |
|---|---|
| FRANKLYN HOFFMAN, KENNETH DERKSON, JOHNNY WOOTEN, ERIC SANDERS, MICHAEL O'CONNELL, STEPHEN HART, WILLIAM JOHNSON, JAMES NORGAARD, and ALTON ANTRIM, | Case No. 16-CV-697-JPS |
| Plaintiffs, | |
| v. | |
| VILLAGE OF PLEASANT PRAIRIE, | **ORDER** |
| Defendant. | |

## 1.    INTRODUCTION

On February 8, 2017, Plaintiffs Franklyn Hoffman ("Hoffman"), Kenneth Derkson ("Derkson"),[1] Johnny Wooten ("Wooten"), Eric Sanders ("Sanders"), Michael O'Connell ("O'Connell"), Stephen Hart ("Hart"), William Johnson ("Johnson"), James Norgaard ("Norgaard"), and Alton Antrim ("Antrim") filed a motion for summary judgment. (Docket #41). Defendant Village of Pleasant Prairie (the "Village") opposed the motion on March 2, 2017. Plaintiffs replied in support of their motion to March 15, 2017. For the reasons stated below, Plaintiffs' motion must be granted in part.[2]

---

[1] Plaintiffs spell the name "Dirkson" in their Second Amended Complaint, (Docket #30 at 1, 9-11), and "Derkson" in their summary judgment materials, (Docket #42 at 13-15). The Court will use "Derkson," the name he signed to his affidavit, (Docket #43-8 at 3), and amend the case caption accordingly.

[2] Plaintiffs also requested leave to file an oversized brief. (Docket #44). Though much of the excess of the brief was ultimately unnecessary, the Court will nevertheless grant the request.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3. RELEVANT FACTS

The material facts are almost entirely undisputed.[3] On April 18, 2016, the Village passed an ordinance regulating residency for child sex offenders within its borders (the "Ordinance"). Plaintiffs initiated the instant suit on June 9, 2016, challenging its constitutionality. The Ordinance prohibited child sex offenders, called "designated offenders" (hereinafter "Designated Offenders"), from residing in the Village within 3,000 feet of a "prohibited location." "Prohibited locations" included "[a]ny school, licensed day-care center, park, trail, playground, place of worship, athletic field used by

---

[3]The facts discussed below are drawn from the parties' respective factual briefs and responses thereto unless otherwise noted. (Docket #45 and #49). The Court further notes that the Village raises a number of "disputes" in its response to Plaintiffs' statement of facts. *See*, *e.g.*, (Docket #45 at 8). The "disputes" are inappropriate because they cite no evidence, and are generally pure legal argument, which is reserved for the parties' legal memoranda, not factual briefing. The Court has ignored those attempted "disputes."

Minors, or any other placed designated by the Village as a place where Minors are known to congregate." (Docket #43-1 at 2). The Ordinance also prevented Designated Offenders from moving into the Village unless they were already domiciled in the Village at the time of their most recent offense. Designated Offenders were excluded from any potential violation of the Ordinance if they resided continuously in a home prior to and after its effective date. This provision was limited by a ban on renewing rental agreements with Designated Offenders which would extend for more than six months beyond the Ordinance's effective date.

The Ordinance further restricted where Designated Offenders could live with respect to each other; offenders were banned from residing within 500 feet of each other. The Ordinance applied to all Designated Offenders without any inquiry into the danger any individual offender posed to the community. It did, however, contain a grandfather clause. The grandfather clause allowed Designated Offenders to stay in their residence if a "prohibited location" was established near them after they took residence. It also permitted them to live with their close family members, provided those family members had resided in the otherwise prohibited area for at least two years.

The Court recognizes that this explanation is somewhat confusing when stated in prose. To better understand the effect of the Ordinance on various Designated Offenders, the Court has prepared the following chart:

| **Nature of Offender** | **Restriction Imposed** |
|---|---|
| 1) Domiciled in the Village at time of most recent offense<br>2) Lived in the Village when Ordinance was passed | None, as long as the offender's home complied with the distance-related restrictions |
| 1) Not domiciled in the Village at time of most recent offense<br>2) Not domiciled in Village when Ordinance was passed | Permanently banned from the Village |
| 1) Not domiciled in the Village at time of most recent offense<br>2) Lived in the Village when Ordinance was passed<br>3) Rented property that did not comply with distance restrictions | Must leave the Village by October 18, 2016, and may never return |
| 1) Not domiciled in the Village at time of most recent offense<br>2) Lived in the Village when Ordinance was passed<br>3) Owned home or lived with family | May remain in that property, but may not move to another home in the Village. If the offender leaves their home for more than thirty days, they may never return. |

*See* (Docket #45 at 4-5).

In passing the Ordinance, the Village prepared a map showing its projected effect on Designated Offender residency. The map revealed that more than ninety percent of the Village would be off-limits to Designated Offenders under the Ordinance. The remaining ten percent was largely non-residential. Moreover, the interaction between the 3,000 foot prohibited zone and the rule against Designated Offenders living near one another further limited the possible dwelling places. Most of the Village's low-income housing, which is all that most of these plaintiffs could afford, was excluded.

When enacting the Ordinance, the Village did not obtain or consider any studies or data regarding the safety risk of allowing Designated

Page 4 of 19

Offenders to live near the various "prohibited locations" identified above, or near one another. In fact, the Village's administrator, Michael Pollocoff ("Pollocoff"), testified that turning child sex offenders into outcasts can create "more deleterious impacts." (Docket #45 at 6). The Village also had no evidence that Designated Offenders domiciled outside the Village at the time of their last offense posed a greater safety risk than those who were. Pollocoff stated that the Ordinance's purpose and goal was to reduce the number of child sex offenders living in the Village.

All Plaintiffs but Norgaard,[4] O'Connell,[5] and Hoffman[6] were not domiciled in the Village at the time of their offense, and rented their abodes, and so fell into the third category from the chart above.[7] Each was told that, in light of the Ordinance's passage, they had to leave the Village by October 18, 2016. Plaintiffs were variously notified of their need to vacate by a letter

---

[4]Norgaard is the manager of the King's Motel, where a number of other designated offenders also live. He did not fear the Ordinance because he was domiciled in the Village at the time he committed his last offense, and the other offenders in the Motel would be moving away, eliminating any conflict with the 500-foot restriction. Norgaard thus fell into the first chart category.

[5]O'Connell lived at a home owned entirely by his girlfriend and did not pay rent. He was thus exempt, per the fourth chart category, from having to move out of the Village, so long as he did not leave the home. He was nonetheless told that he had to leave the Village. The misunderstanding was corrected during the course of this litigation, specifically by a letter sent to O'Connell on August 4, 2016.

[6]Hoffman lived with his mother rent-free, and so fell into the fourth chart category. When his mother decided to sell her home and move to senior housing, Hoffman knew the Ordinance would prevent him from staying in the Village.

[7]This fact is undisputed as to Hoffman, Sanders, Antrim, and Wooten. It is not explicitly stated as to Derkson or Johnson, but the other facts related to those plaintiffs suggest that they to are covered by the third chart category. In any event, it is undisputed that Derkson and Johnson were told that they were subject to the Ordinance and would have to leave the Village.

from the Village's Chief of Police, by conversations with their probation officers, or by conversations with other Designated Offenders. Each Plaintiff has suffered stress as a result of the threat posed by the Ordinance, the difficulties in attempting to secure new housing, and fear of the consequences of homelessness.

The Ordinance was repealed, and a new one created in its place, on September 6, 2016 (the "Amended Ordinance"). The Amended Ordinance lowered the 3,000 foot prohibited zone to 1,500 feet. This would still cut Designated Offenders out of over sixty percent of the Village's land area and seventy-five percent of its residences. The restriction on Designated Offenders living near each other was removed entirely, as was the limit on renewing leases for Designated Offenders living in a prohibited zone. Finally, the Amended Ordinance stated that it did not apply to a Designated Offender whose latest conviction was ten or more years prior to them taking residence in the Village.

4. **ANALYSIS**

Plaintiffs' Second Amended Complaint advances three causes of action. Count One alleges that the Ordinance violates the Ex Post Facto Clause in Article I of the Constitution, because "it makes more burdensome the punishment imposed for offenses committed prior to enactment of the Ordinance and it applies retroactively[.]" (Docket #30 at 22). Plaintiffs seek an injunction against its enforcement and money damages on Count One. *Id.* at 23. Count Two states that the Ordinance also violates the Equal Protection Clause of the Fourteenth Amendment because it differentiates between Designated Offenders who were or were not domiciled in the Village at the time of their most recent offense, without a rational basis for doing so. *Id.* at 23-24. Plaintiffs also seek injunctive and monetary relief on Count Two. *Id.*

at 24. Finally, Count Three seeks a declaratory judgment in favor of O'Connell on the issue of whether he had to leave the Village. *Id.* at 24-25; *see supra* note 5. Plaintiffs' instant motion requests judgment on Counts One and Two as to liability only.[8] The Court addresses each claim in turn.

### 4.1 Ex Post Facto

Initially, the Village contends that Plaintiffs' ex post facto claim is mooted by its repeal of the Ordinance. This Court may only exercise its jurisdiction over live controversies. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016). This requirement applies not only at the start of the litigation, but throughout its entire pendency. *Id.* An action becomes moot, and must therefore be dismissed, when "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit." *Id.* (quotation omitted). A court must take care not to paint over a lawsuit's claims with a broad brush, however. A case only becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party. As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (citations and quotations omitted).

The Village contends that Plaintiffs' claims became moot on September 6, 2016, approximately three months after this action was filed. On

---

[8] Plaintiffs' opening brief discusses their entitlement to compensatory damages for the stress and fear they suffered while the Ordinance remained in force. Confusingly, the brief does not explain why Plaintiffs did so; did Plaintiffs want the Court to award damages at the summary judgment stage? The Village believed so, and responded that Plaintiffs' evidence does not adequately support their claim for damages at this stage. Plaintiffs' reply clarifies that they do not seek an award of damages now, but wish to have their damages evaluated by the jury at trial. With that clarification, the propriety of Plaintiffs' damages becomes a non-issue. Plaintiffs could have prevented confusion for all involved by appropriately titling their motion as one for partial summary judgment.

that date, the original Ordinance they complained-of in the Second Amended Complaint was repealed and replaced with the Amended Ordinance, which either eliminated or limited the effect of the allegedly unlawful provisions. Plaintiffs concede that this renders moot their requests for injunctive relief. Enacting the Amended Ordinance does not, however, do anything to address Plaintiffs' requests for money damages. *Campbell-Ewald* (as well as the Village's own citations) stands for the proposition that Plaintiffs' damages claim, and thus the ex post facto claim as a whole, remains a live controversy. *Fed'n of Adver. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) ("[A] defendant's change in conduct cannot render a case moot so long as the plaintiff makes a claim for damages."). The Village's mootness argument is without merit.

The Village next asserts that the Ordinance did not actually violate the Ex Post Facto Clause because it did not impose a punishment on Plaintiffs. The Clause prohibits retroactive punishment by the government, and as applied here, it restricts how far a governmental entity can go in limiting the rights of sex offenders. *Smith v. Doe*, 538 U.S. 84, 92 (2003). The *Smith* court began its ex post facto analysis with two questions. First, did the government, in enacting the restriction, intend to "establish civil proceedings," or impose punishment? *Id.* (internal quotation marks omitted). If the government intended to punish, the law violates the Ex Post Facto Clause and the inquiry ends there. *Id.* The Ordinance's stated purpose is "not to impose a criminal penalty" but to instead protect the health and welfare of the Village's citizens. (Docket #43-1 at 1). The Court must defer to that statement of intent. *Smith*, 538 U.S. at 92-93 ("[C]onsiderable deference must be accorded to the intent as the legislature has stated it.").

Nevertheless, even if a law purports to be civil in nature, the Court "must further determine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the Village's] intention to deem it civil." *Id.* at 92 (quotations omitted). The Supreme Court requires "the clearest proof" to override the government's stated intention. *Id.* To assess the punitive nature of a restriction, courts analyze five factors:

(1) Does the law inflict what has been regarded in our history and traditions as punishment?
(2) Does it impose an affirmative disability or restraint?
(3) Does it promote the traditional aims of punishment?
(4) Does it have a rational connection to a non-punitive purpose?
(5) Is it excessive with respect to this purpose?

*Does #1-5 v. Snyder*, 834 F.3d 696, 701 (6th Cir. 2016) (citing *Smith*, 538 U.S. at 97).

The Village's argument on this point is brief, conclusory, and fails to meaningfully address any of these factors. It instead gestures at a few cases which it contends have ruled in its favor on this issue, and asks the Court to evaluate and follow those decisions. The Village is mistaken on the law and the Court's duties. The most relevant decisions from across the nation reveal that the Ordinance is nigh unprecedented in its punitive effect. The Court will not distinguish those opinions where the Village has made no effort to do so itself.

As to the first factor, the Ordinance banished Plaintiffs from the Village. Banishment is a traditional form of punishment, and historically "involved the complete expulsion of an offender from a socio-political community." *Shaw v. Patton*, 823 F.3d 556, 566 (10th Cir. 2016). Unlike many other laws restricting sex offender residency, the Ordinance did not simply limit where such people could live. The Ordinance prevented any sex

offenders from moving into the Village and, more importantly, required all sex offenders in leaseholds to leave within six months after its passage. This is, in the Court's view, nothing short of affirmative banishment. *Id.* at 567-68 (residency provision did not resemble historical banishment because it only limited sex offender residency, but did not expel them entirely); *Doe v. Miller*, 405 F.3d 700, 719 (8th Cir. 2005) (same). Not all Plaintiffs are in the same position on this issue, however. Norgaard, O'Connell, and Hoffman were not (properly) subject to the banishment provision of the Ordinance. However, as discussed below, this difference does not change the outcome on this claim.

Even had it tried, the Village could not reasonably contest the second factor. The Ordinance imposed severe restraints on Designated Offenders, limiting their residence to ten percent of the Village's land area, an area which is itself largely non-residential. *See Doe v. Miami-Dade County, Fla.*, 846 F.3d 1180, 1185 (11th Cir. 2017) (this inquiry focuses on the "'how the effects of the [Ordinance] are felt by those subject to it,'" and these offenders alleged homelessness as a result of the county's residency ordinance) (quoting *Smith*, 538 U.S. at 99-100). The third factor is likewise present, though it is of limited importance because punishment goals often overlap legitimate civil regulatory goals. *Snyder*, 834 F.3d at 704. Still, the Ordinance advances the traditional punishment aims of incapacitation, in keeping Designated Offenders segregated to tiny zones of the community; retribution, by imposing its restrictions based solely on Plaintiffs' prior offense conduct; and deterrence, in attempting to keep Designated Offenders away from children to deter recidivism. *Id.*

The fourth and fifth factors are usually considered together, for the less rational a restriction's connection to its stated purpose, the more

excessive it will be in addressing that purpose. *See Smith*, 538 U.S. at 104-05; *Snyder*, 834 F.3d at 704-05; *Miller*, 405 F.3d at 721-723. This is the most important consideration in the ex post facto analysis. *Smith*, 538 U.S. at 102. Further, "to avoid a[n] [excessive] punitive effect, a statute imposing a particularly harsh disability or restraint must allow an individualized assessment. An individualized assessment helps to ensure that a statute's particularly harsh disability or restraint is rationally related to a non-punitive purpose." *Shaw*, 823 F.3d at 575; *Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1017 (8th Cir. 2006) ("Unlike the Iowa law [at issue in *Miller*], the Arkansas statutory plan calls for a particularized risk assessment of sex offenders, which increases the likelihood that the residency restriction is not excessive in relation to the rational purpose of minimizing the risk of sex crimes against minors.").

Decisions from other circuits provide a useful contrast to the Ordinance. In *Miller*, expert testimony was received on the effect of a 2,000-foot residency restriction on sex offender recidivism. *Miller*, 405 F.3d at 722-23. While this testimony was not definitive as to the propriety of that distance as compared to any others, the Eighth Circuit held that it supplied a sufficient rational basis connected to the legislature's non-punitive purpose. *Id*. In *Miami-Dade*, the subject ordinance established a 2,500-foot exclusion zone for schools, with exceptions when "(1) [t]he sexual offender or sexual predator established a residence prior to the effective date of th[e] [O]rdinance; (2) [t]he sexual offender or sexual predator was a minor when he or she committed the sexual offense and was not convicted as an adult; and (3) [t]he school was opened after the sexual offender or sexual predator established the residence." *Miami-Dade*, 846 F.3d at 1183 (internal quotation marks omitted). The *Miami-Dade* plaintiffs alleged that this ordinance

violated the Ex Post Facto Clause because it did not include an individualized risk assessment, it applied to an offender for life, and was passed without any evidence connecting the restriction to an improvement on safety or recidivism concerns. *Id.* at 1185-86. The Eleventh Circuit found that these assertions stated an ex post facto cause of action. *Id.* Finally, *Duarte* highlights the importance of an efficacious grandfather clause, which in that case allowed offenders to stay in their current homes after the subject ordinance was passed. *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 781-82 (E.D. Tex. 2015). The *Duarte* ordinance also contained "multiple affirmative defenses that, if argued and proven, exempt the child sex offender from the residency restrictions." *Id.* at 782.[9]

The Ordinance goes further than any these examples. The Ordinance bans Designated Offenders from the Village without any individualized inquiry into their risk to the community. In a similar vein, it did not offer any method for a Designated Offender to obtain an exemption, even in limited circumstances. Like the *Miami-Dade* ordinance, the Ordinance's banishment

---

[9]The Village cites two Wisconsin appellate court opinions upholding sex offender residency restrictions. Neither case has much persuasive value. *Menomonee Falls v. Ferguson* decided whether an offender was protected by an ordinance's grandfather clause, and said nothing of the constitutionality of the ordinance. *See generally* 799 N.W.2d 473 (Wis. Ct. App. 2011). *City of South Milwaukee v. Kester* actually addressed the ex post facto issue. 830 N.W.2d 710 (Wis. Ct. App. 2013). *Kester* found that the ordinance passed muster under the Ex Post Facto Clause because it did not banish the plaintiff sex offender and, even without an individual risk assessment, the city was entitled to make a reasonable categorical judgment that all sex offenders are dangerous to the community. *Id.* at 719-21. *Kester* is unpersuasive for two reasons. First, the Ordinance is different from *Kester*'s ordinance because it includes an expulsion provision. Second, in line with the above-cited federal precedent, this Court disagrees with *Kester* to the extent that a broad, evidence-free assumption about sex offenders (*Kester* mentions no data or studies on the dangerousness of such persons in the community) is sufficient to make a regulation non-punitive.

applies to Designated Offenders for life. Unlike *Duarte*, the Ordinance's grandfather clause was of limited help to Plaintiffs, because for most of them, it only permitted them to remain until October 2016. Most importantly, the Village has admitted that the Ordinance was based on its own conjecture about the dangers posed by sex offenders. No data or studies on the matter were considered in passing the Ordinance.

The lack of evidence eliminates the possibility that the Village's action was rational. In *Snyder*, the Sixth Circuit faced a comprehensive sex offender registration and residency statute. *Snyder*, 834 F.3d at 697-98. The court found that the statute was not rationally related to the purpose of reduced sex offender recidivism and public safety. *Id.* at 704-05. Though the Supreme Court in *Smith* stated that recidivism rates among sex offenders are "frightening and high," the *Snyder* court found that support for the proposition was lacking in empirical studies. *Id.* at 704. It specifically noted that "nothing . . . in the record suggests that the residential restrictions have any beneficial effect on recidivism rates." *Id.* at 705. *Snyder* found no evidence that "the difficulties the statute imposes on registrants are counterbalanced by any positive effects. Indeed, Michigan has never analyzed recidivism rates despite having the data to do so." *Id.*

The Village fell into the same trap as the Michigan legislature. The Village could have sought objective evidence to support the Ordinance's

severe restrictions but chose not to.[10] Plaintiffs were required to come forward with "the clearest proof" that the Ordinance was intended as punishment. *Smith*, 538 U.S. at 92. If the Village had even a sliver of factual material to support the stated goals of the Ordinance, the outcome of this claim would likely be different. As it stands, however, the Court has no choice but to find that the restrictions imposed by the Ordinance are not rationally connected to its purposes.

The Court concludes that, in balancing the *Smith* factors, Plaintiffs have produced sufficient proof that the Ordinance's stated non-punitive purpose is overborne by its punitive effects. The Ordinance therefore violated the Ex Post Facto Clause and Plaintiffs are entitled to summary judgment on that claim. This result is clearly true for the plaintiffs who were subject to banishment under the Ordinance, namely Derkson, Wooten, Sanders, Hart, Johnson, and Antrim. The Ordinance would not have necessarily banished Hoffman, O'Connell, and Norgaard, for various reasons. *See supra* notes 3-5. As to those three, the lack of banishment makes this case much closer to the others cited above, where the law in question

---

[10]In fact, the Village apparently had evidence that the Ordinance could be counterproductive. Pollocoff stated that the Ordinance could have a negative effect on sex offender recidivism and community safety by making them outcasts. *Snyder* discussed the same issue:

> In fact, one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities. *See* [J.J. Prescott & Jonah E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161 (2011)].

*Snyder*, 834 F.3d at 704-05 (emphasis in original).

withstood Ex Post Facto Clause review. The Court has not differentiated between these sets of plaintiffs, however, because the Village has not argued that it should. The Court will not craft appropriate arguments for a litigant and, particularly in the case of represented parties, will assume that the omission of apparently relevant argument was a strategic choice rather than mere oversight. *John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990) ("This court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel as in this case."); *Gold v. Wolpert*, 876 F.2d 1327, 1333 (7th Cir. 1989).

### 4.2 Equal Protection

The Village first argues that Plaintiffs lack standing to pursue an equal protection claim. The standing doctrine requires that a party must actually have a interest in a case to invoke federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Though there are many nuances to standing, its application here is relatively simple. As raised by the Village, the standing doctrine requires that Plaintiffs must have suffered a concrete injury and favorable decision in the case must offer redress for their injury. *Id.* at 560-61. The Village argues that Plaintiffs were grandfathered into the Amended Ordinance, and with the repeal of the original Ordinance, they now lack standing to maintain an equal protection claim.

The Village's argument misses the mark in two respects. First, as with the mootness issue, the Village focuses on the ameliorative effect of the Amended Ordinance. This is not the relevant inquiry. Plaintiffs have standing to remedy a past wrong, namely the constitutionally violative original Ordinance, regardless of whether they are suffering an injury today. Second, even when one's focus is properly directed to the original Ordinance, Plaintiffs were not grandfathered in as the Village suggests. As discussed

above, most of the plaintiffs were subject to banishment within six months of the Ordinance's passage. Plaintiffs further argue that O'Connell and Hoffman suffered stress because they knew they would have to leave the Village if they ever left their current homes. As before, the Village does not differentiate between each set of plaintiffs. The Court finds, then, that all Plaintiffs but Norgaard have standing because they suffered injury by way of the Ordinance. Norgaard is different because Plaintiffs do not attempt to argue that he suffered a violation of his equal protection rights. (Docket #48 at 4-5). The Court must, therefore, deny summary judgment to him on this claim.

The Village next attacks the substance of Plaintiffs' equal protection claim. The Fourteenth Amendment's Equal Protection Clause "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quotation omitted). Usually, laws pass muster under the Equal Protection Clause "if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. However, when a statute burdens a person's fundamental constitutional rights, courts apply a higher level of scrutiny. *See Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904 (1986).

The parties dispute whether Plaintiffs are members of a protected class, such that the Court would need to give increased scrutiny to the Ordinance. The Court need not wade into that fray, as the Ordinance fails to pass even the lesser threshold of rationality. To prove an equal protection claim under rational basis review, Plaintiffs must show: "(1) the [Village] intentionally treated [them] differently from others similarly situated, (2) the

[Village] intentionally treated [them] differently because of [their] membership in the class to which [they] belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Smith v. City of Chicago*, 457 F.3d 643, 650-51 (7th Cir. 2006). "Under this lenient standard," the Seventh Circuit instructs, a law "must be upheld if [the Court] can reasonably conceive of any justification for it." *Shaw v. Smith*, 206 F. App'x 546, 548 (7th Cir. 2006).

Plaintiffs contend that the Ordinance violates their equal protection rights because it treats certain Designated Offenders differently from others without reason. Those in the first chart category, who were domiciled in the Village at the time of their last offense, were allowed to remain in the Village. Those in the other three chart categories, who were not so domiciled, were variously blocked from moving into the Village, compelled to leave in a short time frame, or forced to remain in their current home forever if they wished to stay in the Village. The Village has admitted that it has no evidence that the difference between these groups—domicile at the time of their last offense—has any bearing on their safety risk to the community.

The Village makes no attempt to address this claim. Instead, it appears to believe that Plaintiffs advance an equal protection claim based on their status as sex offenders versus non-sex offenders. The Village states its position as follows: "The Village of Pleasant Prairie certainly has a rational basis for protecting children against the risks of recidivism of convicted sex offenders." (Docket #46 at 12). This is not the relevant question, and because of its misunderstanding of Plaintiffs' claim, the Village offers almost no relevant argument in opposition to the actual claim presented.

Even so, the Court must uphold a law if it "can reasonably conceive of any justification for it." *Shaw*, 206 F. App'x at 548. Thus, the Court would

likely be compelled to find the Ordinance constitutional if the Village had offered any evidence providing such a justification, even as late as its briefing on the instant motion. It did not, and this failure leaves the Court no choice but to conclude that the Ordinance violated Plaintiffs' equal protection rights in making an irrational domicile-based distinction between Designated Offenders. This comports with the purpose of the Equal Protection Clause. The "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). In light of Pollocoff's comments, and the lack of evidence supporting the Ordinance's restrictions, it appears this is precisely what motivated the Village's action.

5. **CONCLUSION**

In light of the foregoing, the Court grant Plaintiffs' request for summary judgment as to the liability elements of Counts One and Two of their Second Amended Complaint, for all of the plaintiffs save Norgaard. Norgaard is entitled to summary judgment on Count One but not Count Two. Plaintiffs' damages on those counts will be determined by the jury. The Court treats Plaintiffs' claims for injunctive relief as abandoned. This matter remains set for a pretrial conference on May 9, 2017, and a jury trial beginning on May 15, 2017.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment (Docket #41) be and the same is hereby **GRANTED in part** and **DENIED in part** in accordance with the terms of this Order; and

**IT IS FURTHER ORDERED** that Plaintiffs' motion to file an oversized brief (Docket #44) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 17th day of April, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge